## SMALL *vs.* MOTT.

A *guaranty* for the payment of a note is not void on the ground of *mainte-
nance*, although substituted for another *guaranty* for the express purpose
of inducing the holder thereof to *release* the first guarantor so that he
may be called as a witness to maintain an action brought for the recove-
ry of the debt the payment whereof he had guaranteed.

Such first guarantor on being *released* becomes a competent witness, al-
though the substituted security was obtained by his procurement, where
there is no evidence that he had agreed to indemnify the second guarantor.

*Maintenance* is no longer an offence here, except as to the buying and sell-
ing *pretended titles to land* and *falsely moving and maintaining suits.*

ERROR from the supreme court.    Mott sued Small in an
action of *covenant* on an agreement under seal, bearing date
14th April, 1834, whereby the defendant engaged to *guar-
antee* the payment of a note made by John D. Petrie and
Adam Petrie, which had been transferred to the plaintiff by
George H. Feeter, and who had *guaranteed* the payment
thereof.    The agreement purported to have been executed
in consideration of the sum of *one dollar* paid to the defend-
ant, but the true consideration was the *release* of Feeter so
that he might be a witness to resist the defence of payment
set up by the *Petries* in an action upon the note, pending at
the time the agreement of the defendant was executed.    The
defendant was induced to enter into the agreement by Feeter
and *not* by the plaintiff.    Feeter and the defendant called
upon the counsel for the plaintiff in the suit against the Pe-
tries, and the defendant executed the agreement, and the
*release* of Feeter, which had been previously executed by
the plaintiff, was delivered to Feeter.    The nature of the
defence set up by the Petries, which was payment, was *not
explained* by the counsel of the plaintiff to the defendant at
the time the latter executed the agreement.    The cause
was tried, Feeter was sworn as a witness, and upon his tes-
timony the plaintiff obtained a verdict against the defend-
atns.    That verdict was set aside, and upon a second trial
the defendants succeeded.    Whereupon Mott brought his
action against the now defendant, claiming the amount of

the note and all costs to which he had been subjected. To this action the defendant pleaded *non est factum* and several special pleas; the substance of which was, that the plaintiff and Feeter had *conspired* together falsely to move and maintain a suit upon the note against the Petries, that it was agreed between the plaintiff and Feeter that Feeter should procure the defendant to guarantee the payment of the note, and that thereupon the plaintiff should *release* Feeter so that he might be a witness in the cause; that the defendant had no interest in the matter, that he received no consideration for his agreement, and that Feeter was not released at his request. That the plaintiff *fraudulently represented* the note of the Petries to be a good and valid note for a subsisting debt; that he *fraudulently concealed* the fact that the note was paid; and that the note was prosecuted by the plaintiff for the benefit of Feeter. Upon all which pleas the plaintiff took issue. On the trial of the cause the facts appeared as above stated. When the evidence was closed the counsel for the defendant insisted that it should be submitted to the jury, and that it was sufficient to warrant them to find for the defendant upon the issues joined upon the special pleas; that the agreement declared upon being given for the purpose of maintaining the suit against the Petries, the consideration was vicious; that the jury would be warranted in finding a *fraudulent concealment* of the fact of payment, that the agreement was obtained by covin, and was executed without consideration. The circuit judge decided that there was not sufficient evidence to go to the jury on either of the issues upon the special pleas, and that the agreement was a valid instrument: to which decision the defendant's counsel excepted. The defendant then *offered to prove* that the facts of the case of the plaintiff against the Petries were materially different from what they had been testified to by Feeter on the trial of that cause at the circuit when the plaintiff obtained a verdict: which evidence was rejected by the judge, and the jury under his direction found a verdict for the plaintiff. The defendant applied to the supreme court for a new trial, which was refused, and judgment rendered for the plaintiff. See case

Small v. Mott.

and opinion delivered in the supreme court, 20 *Wendell*, 212, *et seq.* The defendant sued out a writ of error. The case was argued here by

D. *Burwell,* for the plaintiff in error.

W. C. *Noyes,* for the defendant in error.

After advisement the following opinion was delivered :

By the CHANCELLOR. The first if not the principal objection, which is urged by the counsel for the plaintiff in error against the judgment of the supreme court is, that the covenant upon which the suit was brought was *void for maintenance.* In answer to this, it is insisted by the counsel for the adverse party, that maintenance was not an offence at the common law, and that as the legislature has intentionally repealed all the statutory provisions on the subject, except as to the buying and selling of pretended titles to land, maintenance was not illegal at the time this covenant was given. I have very little doubt that most of the absurd rules relative to maintenance, which are found in the early reports of the English courts of justice, were founded upon the broad and sweeping provisions of the statutes 3 Edward I. ch. 28 and ch. 33, and 28 Edw. I. st. 3, ch. 11, and of several other statutes of the same kind, passed in the reigns of Edward the third and of the second Richard. Probably the term *maintenance* was unknown to the law previous to the passage of the statutes on this subject in the time of Edward the first ; but that species of maintenance called *champerty,* or *Champarty* as it was originally spelled, see *Year Book,* 8 *Hen.* 5, *p.* 8, appears to have been an offence at the common law. It is unquestionably derived from an old French law term, *champart,* which was used to denote a customary field rent, consisting of a certain part of the crops in kind ; which answers to the ordinary case in this country of renting a farm for a part or share of the produce. 3 *Guyot's Repert. de Jurisp.* 85. Champerty, therefore, was probably first used in England as a law term,

by the followers of William of Normandy and their succes-
sors, to denote an illegal agreement by a stranger to assist
in the prosecution of a suit, in consideration of the subsequent
receipt of a part of the produce or fruits of the litigation.
*Sir Edward Coke* says an action of maintenance lies at
the common law ; and if maintenance in general was against
the common law, *a fortiori* champerty, for that of all main-
tenance is the worst ; and in reference to the statute, 3 Ed-
ward I. ch. 25, which was the first statute on the subject of
champerty, and before any of the statutes of maintenance, he
refers to *Bracton*, who wrote before the passing of this first
statute of champerty, showing that champerty was forbid-
den by the common law as calculated to suppress justice
and truth. He therefore concludes it is *malum in se* by the
common law, as well as *malum prohibitum* by the statutes.
*Coke's 2 Inst.* 208. The note of the revisers also shows that
they well understood the distinction between this most odi-
ous species of maintenance called champerty, and mainten-
ance in the ordinary sense of the term : for they say, ." it is
proposed to abolish the law of maintenance, and to qualify
that of champerty, by permitting mortgages of land in dis-
pute to raise money, under guards and restrictions which
will prevent abuse." 3 *R. S.* 828, *App. 2d ed.* I am pre-
pared to say that all the absurd doctrines of maintenance
that grew out of the statutes which might have been neces-
sary in a semi-barbarous age, were swept away by the re-
cent revision of the laws, and many of them had been vir-
tually abrogated long before that time. I do not think, how-
ever, that agreements actually champertous, as where a
stranger to the subject of the litigation, who has no interest
therein in law or equity, or in expectancy, by the ties of
blood or affinity, agrees to assist in embroiling his neighbors
in litigation, or in carrying their suits through the different
courts after they are commenced, upon a stipulation that he
shall receive a share of the fruits of the litigation as a reward
for his mischievous interference, can be enforced in courts
of justice.

I have therefore examined the case now under consider-
ation to see if it could, upon any view of the facts, be brought

within this principle. I find that it steers clear of every thing like champerty, and it certainly was not maintenance so far as the plaintiff was concerned. The remarks of Justice Bay-ley in *Bell* v. *Smith*, 5 *Barn. & Cress*. 188, are therefore wholly inapplicable to this case. Here the note against the two *Petries* was not a litigated claim, purchased up or prose-cuted by the plaintiff as a stranger, under an agreement that he should have a part of the fruits of the litigation. On the contrary, it was a negotiable note transferred to him by *Fee-ter* in part payment of a debt, under a representation that it was due and against a responsible farmer, and upon a writ-ten guaranty that it was collectable ; and he had not the least reason to suspect the contrary until after it was put in suit. Under such circumstances, as *Feeter* insisted that the note was justly due to him at the time of the transfer, upon the facts which he afterwards swore to upon the trial, the plaintiff was probably bound to bring his cause to trial to enable him to have his remedy over against *Feeter* for the debt and cost of suit, if he should not succeed in recovering the same of the makers of the note. He was willing, there-fore, to release his claim upon *Feeter*, so that he might be a witness to rebut the defence which the defendants had set up, provided *Feeter* would procure some one of his friends to come forward and assume his responsibility as guarantor. Such an agreement would have been corrupt and illegal, if the plaintiff had supposed that an arrangement was to be made between *Feeter* and his friend who became the substantial guar-antor, that the latter should have a claim back upon *Feeter* to indemnify him against this substituted guaranty. But as the defendant does not pretend that he made such an agreement to render Feeter *apparently* a competent witness, when he was in fact still *interested* by reason of this new indemnity to the guarantor, I presume there was no such agreement between them. Indeed such an arrangement between *Feeter* and *Small* might be indictable as a conspiracy to impose upon the court and to prevent the due administration of justice, so as to subject them to an indictment for a criminal offence. *See* 2 *R. S.* 692, § 8, *sub.* 6. The court cannot, therefore, in

the absence of any allegation or proof of such a conspiracy, presume that any thing of that kind was intended either by *Feeter* or *Small*. So far as the plaintiff was concerned he certainly was not cognizant of any such agreement, and nothing was said in the presence of his counsel, from which such a corrupt agreement could be inferred. The counsel for the plaintiff was not authorized to act for him in procuring some one to be the substituted guarantor, but merely to approve of the sufficiency of such person as should be offered on the part of Feeter. What arrangements may have been made between the defendant and Feeter, or what information the latter may have given to Small before they came to the plaintiff's counsel to have the guaranty signed and delivered, it was impossible for the counsel to know. But it cannot fairly be presumed that Feeter induced the defendant to call upon the counsel for the purpose of executing such a paper, without explaining to him beforehand the object and intent of the guaranty. It was not therefore the duty of the counsel for the plaintiff to tell him what he had a right to presume he already knew, except so far as inquiries were made in his presence showing that the defendant was ignorant of the nature of the defence and of the responsibility he was assuming.

No pecuniary consideration passing directly between the plaintiff and the defendant was necessary, to support the new guaranty. The injury which the plaintiff might sustain by relinquishing the guaranty of Feeter, was the real consideration, and that was sufficient. If there was any intentional fraud, or illegality, or any conspiracy to maintain a false suit, or to impose upon the court, *Mott* was not a party to it, or cognizant of it. He is in the same situation as if the defendant, without seeing either him or his counsel, had executed and delivered this guaranty to Feeter, to carry to Mott and get a release from his original indemnity. If the business had been transacted in that form, I think no court upon this evidence could have supposed that the defendant had sustained the allegations in either of his special pleas.

The offer to contradict what the witness swore to on the first trial was properly rejected. Proof that he was under a mistake, or even that he swore corruptly on that occasion, would not better the defendant's case, as it would not be sufficient even to create a suspicion that the plaintiff had any reason to suppose he intended to swear to an untruth, and something more than suspicion would be necessary to authorize a jury to infer that the plaintiff was guilty of subornation of perjury. If Feeter was attempting to enforce the collection of a note which he knew was not justly due to him, in consequence of what had taken place before he became the owner of such note, it is certainly to be regretted that this defendant volunteered as his friend, to assist him in collecting it, in payment of the debt to Mott. But as there was no evidence which could have authorized the jury to find a verdict for the defendant upon any of the issues charging the plaintiff as a *participator* in any fraud or known illegality, the learned judge who tried the cause very properly decided that there was not sufficient evidence to go to the jury on those issues. The sufficiency of the evidence, where the facts are undisputed, is a question of law for the court to decide.

For these reasons I think the judgment of the court below should be affirmed.

On the question being put, *Shall this judgment be reversed?* the members of the court divided: *four* answering in the *affirmative*, and *seventeen* in the *negative*. Whereupon the judgment of the court was affirmed.