Hubbard, J.
The defendant insists upon the illegality of the contract, as the ground of defence to this action: First. That the contract was void as against public policy, and second, because of its champertous character. There is no ground upon the facts of this case for the allegation of either of these defences. As to the first, no principle of the public law of the state was infringed by the terms of the contract or the manner of its performance; and as to the second, the doctrine of champerty does not prevail in this state, except so far as it is recognized by statute, which has no application to this case.
Contracts illegal at common law, as being contrary to public policy, are such as injuriously affect or subvert the public interest (1 Story Eq. Jur., § 259, note), such contracts as by their terms or contemplated manner of performance must work some mischief affecting the body politic. Comyn in his work on contracts, p. 53, says: “ All contracts or agreements which have for their object anything 'which is either repugnant to justice, or in violation of religion or public decency, are void. So are all contracts made in contravention of the general policy of the common law, or in direct opposition to the provisions of an act of parliament, for ex turpi contractu actio non oritur is a rule both of law and equity.”
*292 This doctrine of the law is fully adopted by the courts in this country, and is essential to the good order of society and the just administration of public affairs. The coercive power of the law is withheld,.to compel the performance of any contract, inter partes, which has for its object the commission of a public offence or wrong, although not per se criminal. The cases where the doctrine of public policy has been applied most commonly are in respect to contracts made in restraint of trade, of marriage, those which affect injuriously the legislation or administration of justice of the state, wager contracts and contracts affecting ' the public morals. The adjudications in this class of cases proceed on the ground of some public injury which the performance of the stipulations of the parties would be likely to produce. The aid of the law is not withdrawn from any consideration of the rights or equities of the parties, as between themselves, but solely to prevent an infringement of the public law or policy of the state.
In the case at bar, no public interest was violated in the execution of the contract. The defendant’s preemption right to the lot was fully recognized by the government in the appraisal of his erections, under the act of 1848, at a sum exceeding $200. The purpose of the contract was to induce the commissioners of the land office to act ujron the question, and to determine whether the state needed the lot to be reserved for the use of the canal or salt springs. The commissioners, as a body, had previously omitted to act on the subject. It was the defendant’s right to urge and to procure this determination; and to this end he could call in the services of an agent to act in his behalf, and to stipulate for a reasonable compensation. In such an agency the public would have no interest. If it were legitimate to look into the manner of the performance by Trowbridge of the contract, in order to determine the intent of the parties when the ágreement was entered into, it would be found that no just exception could be *293 taken. His services were all performed before the board of commissioners as a body. In the case of Harris v. Roof’s Executors (10 Barb., 489), the contract was declared illegal, because all the services of the agent were performed with individual members of the house, and not before the house as a body, or its authorized committee. I can see no objection to the employment of an agent or attorney to appear before the legislative body, or a committee thereof, to procure a recognition of a claim against the state, and to the payment of compensation therefor. It is quite a different thing to stipulate for a purely lobby agency.
It seems to me, therefore, that no principle of public policy was infringed by the contract in question. Its object and the manner of its performance are entirely legal.
The judgment must therefore be affirmed.
Selden, J.
The defendant makes two points, viz: 1. That the contract was void as against public policy; and 2 That it amounted to champerty, and was void for that reason. It is important in the outset, in order that our notions in regard to the case may be distinct and definite, that we ascertain the difference between these two grounds of defence. We may see what is intended by the first,- by referring to the only case cited in its support, that of Harris v. Roof's Executors (10 Barb. S. C. R., 489). In that case the plaintiff sought to recover for his services in personally soliciting members of the legislature in regard to the allowance of a private claim against the state. The proof was, that the plaintiff “ went to see members to get them to aid in voting for the claim,” and' the witness saw him “ conversing with them at some of the principal hotels in Albany.” It was held that he could not recover.
Now, the court did not mean, by this decision, to hold that one who has a claim against the state may not employ competent persons to aid him in properly presenting such claim to the legislature, and in supporting it with the neces *294 sary proofs and arguments. Mr. Justice Hand, who delivered the opinion of the court, very justly distinguishes between services of the nature of those rendered in that case and the procuring and preparing of the necessary documents in support of a claim, or acting as counsel before the legislature or some committee appointed by that body. Persons may no doubt be employed to conduct an application to the legislature, as well as to conduct a suit at law; and may contract for and receive pay for their services in preparing documents, collecting evidence, making statements of facts, or preparing and making oral or written arguments, provided all these are used, or designed to be used, before the legislature itself or some committee thereof as a body; but they cannot with propriety be employed to exert their personal influence with individual members, or to labor in any form, privately, with such members out of the legislative halls. Whatever is laid before the legislature in writing, or spoken openly or publicly in its presence or that of a committee, if false in fact may be disproved, or if wrong in argument may be refuted, but that which is whispered into the private ear of individual members is frequently beyond the reach of correction. The point of the objection in this class of cases then is, the personal and private nature of the services to be rendered.
Champerty, on the other hand, according to Hawkins, is “ the unlawful maintenance of a suit, in consideration of some bargain to have part of the thing in dispute.” The gist of this offence, therefore, consists in the mode of compensation, irrespective of the particular manner in which the suit is to be maintained, because all maintenance of a suit by a stranger was at common law “ unlawful.” In the present case, if the procuring from the commissioners of the land office of the title to the lot in question be considered as strictly analogous to an application to the legislature for the allowance of a private claim, there is nothing in the terms of the contract itself to show that the parlies *295 contemplated any services of that secret and private nature to which I have referred, nor was it proved upon the trial that any such services were rendered, or any undue or sinister means resorted to by Trowbridge. I see nothing whatever, therefore, to bring this case within the principle of that of Harris v. Roof’s Executors (supra), or within that rule of public policy which condemns the employment of “ lobby agents” to aid in obtaining acts of special legislation.
In regard to the objection of champerty, however, the case is different. The contract provides expressly that, in consideration of the trouble and expense to be incurred by Trowbridge in procuring the title to the lot in question, the defendant would convey to him an undivided half of the lot. If, then, we consider the proceedings to procure such title as equivalent to the prosecution of a suit at law, which in my judgment it more nearly resembles than an application to the legislature, the case is brought directly within the definition of champerty as above given. It becomes necessary, therefore, to inquire how far the ancient law of champerty remains in force in this state.
The generic offence, of which champerty is a species, is maintenance, which consists in the maintaining or assisting, by a stranger, of either party to a suit, with money or otherwise, to prosecute or defend it. The doctrine of maintenance, in England, rests mainly upon a series of ancient statutes, commencing with the statute of Westminster (1 Ch., 28), and ending with 32 Henry VIII. (ch. 9). It was, nevertheless, an offence at common law, which subjected the guilty party to fine and imprisonment, as well as to a civil suit for damages. The reasons, however, upon which the ancient doctrine was based, would seem even in England to have so far ceased, that some of the judges in that country more than half a century since were disposed to treat the doctrine itself with disfavor. In the case of Masters v. Miller (4 Term R., 320-340), Buller, J., says: “ It is curious, and not altogether useless, to see how the *296 doctrine of maintenance has from time to time heen received in Westminster Hall. At one time, not only he who laid out money to assist another in his cause, but he that by his friendship or interest saved him an expense which he would otherwise be put to, was held guilty of maintenance. (Bro., title Maintenance, 7, 14, 17, &c.) Nay, if he officiously gave evidence, it was maintenance; so that he must have had a subpoena or suppress the truth. That such doctrine, repugnant to every honest feeling of the human heart, should be soon laid aside, must be expected. Accordingly a ■ variety of exceptions were soon made.”
It is true that this language of Mr. Justice Buller relates chiefly to a particular application of the doctrine; but in this country,'and especially in this state, the whole law of maintenance, except so far as it is embodied in our statutes has been repeatedly regarded by the courts as inapplicable to the present condition of society, and substantially obsolete. In Thallhimer v. Brinckerhoff (3 Cow., 623—644), Chancellor Sanford discussed the subject as follows: “ The English doctrine of maintenance arose from causes peculiar to the state of society in which it was established. The great reason, for the suppression of champerty and maintenance was an apprehension that justice itself was endangered by these practices. Blackstone (4 Com., 135) speaks of this offence as perverting the process of law into an engine of oppression. In the case of Slywright v. Page (1 Leon., 167), it was said by'the whole court of common pleas that the meaning of the statute of 32 Henry VIII., concerning maintenance, was ‘ to repress the practices of many who, when they 'thought they had title or right to any land, for the furtherance of their pretended right, conveyed their interest in some part thereof to great persons, and with their countenance did oppress the possessors ’ The power of great men to whom rights of action were transferred in order to obtain support and favor in suits brought to assert those rights, the confederacies which *297 were thus formed, and the oppression which followed from the influence of great men in such cases, are themes of complaint in the early books of the English law. While the power of nobles and great men was felt in the administration of justice, these practices seem to have produced real and great evils.”
That the law of maintenance had its foundation in the existence of a class of nobles, who, by their great power and influence, could overawe the courts and pervert the course of justice, is proved not only by the passage in Leonard, quoted by the chancellor, but by several of the ancient statutes on the subject. By the statute of 1 Edward III. (ch. 14), it is enacted “ That none of the king’s ministers, nor no great men of the realm, by himself nor by other, by sending of letters or otherwise, nor none other, great or small, shall take upon them to maintain quarrels nor parts in the country, to the disturbance of common right.” The statute of 1 Richard II. (ch. 9) also recites that many persons having true title to lands, &c., were wrongfully delayed, “ by means that the defendants did make gifts and feofments of their lands in debate, and of their goods, to great men, against whom the pursuants durst not make their pursuits,” &c.
Since the enactment of those statutes the condition of things has so wholly changed, even in England, that the law of maintenance has fallen, in a measure, into desuetude. But in this country, where no aristocracy, nor any privileged class, elevated above the mass of the people, has ever existed, there would seem never to have been any good reason for the prevalence of that law. Still, deference for English legislation induced the reenactment, at an early day, in this state, of the law of maintenance. By § 1 of our statute (1 R. L., 172) it was enacted “ that no officer or other person shall take upon him any business that is or may be in suit in any court, for to have part of the thing in plea or demand; and no person, upon any such agreement, shall *298 give up his right to another; and every such conveyance or agreement shall be void; and every person who shall maintain any plea or suit, in any court, for lands, tenements or other things, for to have part or profit thereof, shall be punished by fine or imprisonment.” Section 8 of the same statute prohibits the buying or selling of any pretended right or title to lands, unless the person selling, or his ancestors, or those under whom he claims, have been in possession thereof, or of the reversion or remainder, or taken tire rents and profits for one year next before the sale, upon the pain of forfeiting the value of the lands, &c.; and §9 prohibits any person from unlawfully maintaining another in any matter or cause, in suit or variance, concerning lands, goods or debts, &c., upon the pain of forfeiting $250.
This statute embraces the law of maintenance as it existed in this state at the time the case of Thailhimer v. Brinckerhoff (supra) was decided, and up to the enactment of the Revised Statutes, when a very sweeping change was made in that law. In lieu of the provisions just referred to, the revisors reported §§ 5, 6 and 7 of our present statute (2 R. S., 691), the first of which prohibits any officer or other person from taking any convej'ance of lands from any person not in possession, while such lands are the subject of controversy by suit, knowing the pendency of such suit; the second prohibits the buying or selling of any pretended title to lands, unless the grantor and those under whom he claims shall have been in possession for the space of a year before the sale; and the third excepts mortgages of lands by persons not in possession, and conveyances by such persons to those in possession. To the last of these sections the revisors appended the following note, viz.: “It is proposed to abolish the law of maintenance, and to qualify that of champerty, by permitting mortgages of lands in dispute, to raise money, under guards and restrictions which will prevent abuse. It is thus hoped that the objects of the champerty act may be attained, while means will be pro *299 yided of enabling a destitute claimant to prosecute his rights.” This note demonstrates that the revisors supposed the law of maintenance depended entirely upon the previous statute, and that the repeal of any portion of the statute would put an end to so much of that law as was embraced in the portion repealed; because, while they avow their intention to abolish the law, they propose no other means of doing so except such repeal; and secondly, it shows that by “ champerty ” the revisors understood, not that particular species of maintenance which consists in aiding in the prosecution of a suit under an agreement to share in the avails, but the buying of pretended titles to lands from parties not in possession. This is evident, because they.speak of continuing the law of champerty with modifications; and yet this constitutes the only portion of the statute retained. It is plain, therefore, that the revisors, and the legislature which adopted their report and expressly repealed the old law (3 R. S., 151, 2d ed., pl. 62), intended to abolish not only the general law of maintenance, but that of champerty as defined by Hawkins, Blackstone and others, which consists in rendering aid in the prosecution of a suit under an agreement to share in the avails. It is in this latter sense only that the law of champerty could have any application to this case.
In the case of Mott v. Small (20 Wend., 212), although the court declined “to pronounce definitely” upon the question whether any portion of the law of maintenance existed in this state except that part retained by and incorporated in the Revised Statutes, yet Mr. Justice Co wen, in the course of his opinion, says: “But be the English law as it may, with us, at least, I should apprehend it would now be very difficult to say there can be a case of maintenance beyond the purview of our new revised statutes.
In the same case in error (22 Wend., 403), Chancellor Walworth, on the contrary, seems to think that some portion *300 of the old law of champerty still remains; and he quotes the note of the revisors, above referred to, as showing that they intended to distinguish between champerty and maintenance, and to abolish the latter offence while retaining the former. But it has been already conclusively shown that the revisors did not use the term champerty in its ordinary legal acceptation; and hence their note, instead of supporting, goes decidedly to refute the chancellor’s position. That position is also directly in conflict with the opinion of Ch. J. Bronson, in the subsequent case of Peck v. Briggs (3 Denio, 107). He there says: “It is then said that the agreement about the suit against Tompkins was void on the ground of maintenance. In the late revision of the laws, nothing was left of the old doctrine of maintenance beyond a prohibition against taking a conveyance of lands in suit, buying or selling pretended titles, and conspiracies falsely to move or maintain suits.” The act of one who assists in “embroiling his neighbors,” mentioned by Chancellor Walworth, is barratry, a distinct offence from that of champerty, and still punishable.
Were what has been now referred to all there is to show the sentiments entertained by legislators and jurists in this state in regard to the law of champerty and maintenance, I should have little hesitation in holding that no part of that law is now in force here, except the portion expressly retained by the Revised Statutes. But this conclusion 1 eceives much additional strength from the enactments of the Code. It is universally conceded that that rule of the common law which prohibited the assignment of choses in action was a branch of the law of maintenance. Coke says: “Nothing in action, entry or reentry, can be granted over: for so, under color thereof, pretended titles might be granted to great men, whereby right might be trodden down and the weak oppressed” (Coke Litt., 114, a); and Buller, J., in Masters v. Miller (supra), says: “It is.laid down in our old books that, for avoiding maintenance, a chose in *301 action cannot be assigned,” citing Coke Litt. (114, a; 266, a); 2 Roll. (45, l. 40); and lie adds: “The good sense of that rule seems to me to be very questionable; and in early as well as modern times it has been so explained away that it remains at most only an objection to the form of the action in any case.” The Code, by abrogating this technical rule of the common law, has manifested the same hostility to the principles of the law of champerty and maintenance which had been before so often exhibited. Notwithstanding the truth of what is urged by Chancellor Walworth, in Small v. Mott (22 Wend., 403), that these, being offences at common law, were not necessarily abrogated by the repeal of the statute (1 R. L., 172), which was, in the main, simply declaratory, I still think, in view of the manifest tendency of modern judicial opinion, as well as of the plain scope and intent of our legislation on the subject, that not a vestige of the law of maintenance, including that of champerty, now remains in this state, except what is contained in the Revised Statutes.
This conclusion is decisive of the case, and leaves no reason, either in law or equity, why the defendant should not specifically perform the agreement set out in the complaint.
The judgment of the supreme court should be affirmed, with costs. •
All the judges, except Mitchell, J., concurred in the foregoing opinion of Selden, J.
Judgment affirmed.