By the Court. Bosworth, J.
Was Himmons rightfully excluded from testifying? He was not a partner of the defendants at the time of the transaction in question, nor had he any pecuniary interest then in the business of the firms of which they were members. The agreement of the 13th of October, 1854, creates the only objection raised to his competency as a witness; that was executed after the property in question had been sold by the defendants, and the proceeds of it had come into their hands.
If the question of his admissibility was to be determined by the rules of the common law, why was he not a competent witness when he was last offered ?
At that time, he had assigned to the defendants, all his interest in the defendants’ firm, as to all business transacted prior to the 23d of October, 1854. The defendants had released him from all liability to contribute towards the payment of any judgment the plaintiffs might receive, or for the costs or expenses of this action. They had also fully indemnified him against all liabilities and claims, to which he could be subjected by reason of this action, or of any thing growing out of it, and against all damage by reason of his liability to contribute to pay any judgment that might be recovered in this action, or to pay any part of the ex-pensés thereof, or of the claims and demands of the plaintiff.
After those papers had been executed and delivered, it is diffi *336 cult to perceive why his legal position was not precisely the same as it was before that agreement was made. From that moment" he ceased to have any interest in the result; whether the defendants succeeded or failed, was a matter of indifference to him in a pecuniary point of view.
Excluding the provisions of the Code, I think he was a competent witness, and that his rejection was an error which entitles the defendants to a new trial. (Clarkson v. Carter, 3 Cowen, 85; Lifferts v. De Mott & Ingersoll, 21 Wend. 136; Small v. Mott, 22 Wend. 403; Gregory v. Dodge, 14 Wend. 593 ; Lake v. Auborn & Hodgkins, 17 Wend. 18; Benedict & Lothrop v. Hecox, 18 Wend. 490).
It will not be seriously contended, that it was the object of the Code to increase the causes of incompetency to be a witness; on the other hand, it declares that a mere interest in the event, no matter how clear and direct, shall not render any person incompetent to testify, unless he be a party to the action, or one for whose immediate benefit it is prosecuted or defended. (Code, §§ 398, 399).
The Code retains the rule, that an interest in the event, shall disqualify, when the person offered as a witness is a party to the action, or if it is prosecuted or defended for his immediate benefit.
Such an interest excluded persons before the Code. By the pre-existing rules, a person for whose immediate benefit an action was prosecuted, if not a party to it upon the record, could be rendered a competent witness; that was expressly decided in Lake v. Auborn & Hodgkins, supra.
Without pursuing this question further, we think it quite clear, that as Nimmons was rendered incompetent to testify, solely by reason of the agreement of the 13th of October, 1854, that interest was wholly divested by the papers executed and delivered before he was last offered. From that time his position, in contemplation of law, was exactly the same that it was before the agreement of the 13th of October was executed, and he was a competent witness.
Next, as to the question of ratification. Patterson bought of the plaintiffs, 1897 barrels of flour. They had no interest in the residue of the flour, on which the defendants had advanced to Patterson. The defendants had made advances on 8164 barrels, all of which had been shipped to Richardson, Spence & Co. Be *337 fore the 17th of May, the plaintiffs had in their possession, an account rendered by the defendants to Patterson, showing the transactions between them, the dates and amounts of their advances, and the number of barrels on which the defendants had advanced.
With full knowledge of all the frauds now alleged, (except the pretended fraud of Patterson’s going to Europe at the instigation of, or by connivance with some one of defendants’ firm) thejr received Patterson’s order on the defendants, to pay to the plaintiffs the proceeds of the 8164 barrels, less the advances previously made by the defendants upon it, and their charges. Before this was accepted, Patterson’s assent, written at the foot of the order, that no further advances should be made, by the defendants, unless by the consent of the plaintiffs, evidenced by their written order, was procured. The plaintiffs received this, with the written acceptance by the defendants of Patterson’s order.
By this act the plaintiffs certainly waived all right to claim that a sale of the flour by the defendants would be a tortious act, which would render them liable for a conversion of the flour. They assented to a sale of so much of the flour as had belonged to them, and obtained an agreement that they should be paid the proceeds of not only that flour, but of six thousand two hundred and sixty-seven barrels in addition, to which they had no right, less advances and charges.
The flour has been sold as that arrangement contemplated, and the whole proceeds of the flour have been paid to, and accepted by, the plaintiffs, in full performance of that arrangement.
Before the defendants accepted this order, they had refused to accept a draft drawn on them by Patterson, in favor of the plaintiffs, for $10,000, at sixty-five days from May 17, 1854. The defendants claimed to have advanced on the security of the flour, in good faith, with no notice of any facts which should induce any person to doubt the title of Patterson,-or the good faith of his transactions with those of whom he had purchased the flour. Under these circumstances, the plaintiffs accepted the three papers' before mentioned; viz., Patterson’s order on the defendants; an acceptance of it by the latter, and Patterson’s written consent that the proceeds should be paid to the plaintiffs, or to their order. Is' this transaction to have any effect, and, if so, what? If it does *338 not amount to an abandonment of all claims upon the defendants personally, except under their written acceptance of Patterson’s order, then it,is not only of no benefit to them, but is prejudicial to their rights. By the verdict they are charged, not only with the actual proceeds of the one thousand eight hundred and ninety-seven barrels of flour, but with the exact price which Patterson agreed to pay the plaintiffs for it. The defendants, as the case has resulted, have been made to pledge the proceeds of the whole eight thousand one hundred and sixty-four barrels over and above advances, as security to pay what Patterson was owing the plaintiffs, and are held personally liable to pay the balance of the contract price. This result has been effected upon evidence which, being fairly considered, does not tend to prove any “ fraud on the part of Richardson, nor on the part of Patterson, in making the purchase.” So the Chief-Justice instructed the jury.
In the absence of fraud, either of Patterson or of the defendants, in the transaction, we think that the acts of the parties on and after the 17th of May, amount to an agreement between them, that the whole flour on which the defendants had advanced, should be sold by the persons to whom it had been consigned, and that the defendants might retain' out of the proceeds the amount of the advances which they had made on the security of the flour, and their charges, and that the balance of the proceeds should be paid to the plaintiffs. The advantage secured to the plaintiffs, was the contract of the defendants to pay to the former the whole net proceeds, beyond the advances and charges. This agreement has been fully executed on the part of the defendants. Any undeclared intent of the plaintiffs, in entering into the arrangement, cannot affect its legal operation, nor impose upon the defendants, or continue any liability on their part, which, in the absence of any such intent, would not exist. (Freeman v. Spaulding, 2 Kernan, 373.)
The affidavit made by John Wilmot, on the 2Qth of May, 1854, the third day after this arrangement between all the parties, afi firms that the sale and delivery to Patterson were absolute, an express promise by Patterson, subsequent to the delivery, to pay on the 17th the full contract price, and a failure to perform his promise. That affidavit was made to procure an attachment against the property of Patterson. An attachment can be issued *339 only in an action for the recovery of money. (Code, § 227.) An affidavit which can authorize one to be issued, must show that a cause of action exists against the defendant. The cause of action stated in this affidavit, arose on contract, for goods sold and delivered to Patterson.
Without stopping to inquire whether the plaintiffs, after having instituted a proceeding to seize the property of one of the parties to this transaction, on an unqualified affidavit of an unconditional sale and delivery, are precluded from asserting the contrary, as a basis of different remedies, it is clear that the affidavit furnishes very strong evidence against the plaintiffs that the order of Patterson, as accepted by the defendants, was taken as a settlement of all claims of the former against the latter, except such as might justly be based upon the acceptance itself.
We think the defendants had a right to have the jury instructed in the terms of their fifth request, and that the instruction, that if Wilmot “ did not intend to give up his claim, he is not bound,” was erroneous. Some questions of minor importance, in relation to the admission of evidence, remain to be considered.
It is not apparent that the fact that the defendants had been in the habit of making advances to Patterson, or the fact that he had or had not made purchases from the plaintiffs prior to this, tended to throw any light upon the actual character of the transaction in question, or that they would authorize any inferences by the jury, in relation to the truth of the matters at issue, which they could not have made if no such facts had been proved. This evidence was received against the objection and exception of the defendants.
It is not easy to perceive on what principle its admission can be justified. The evidence being incompetent, and the defendants having excepted to its admission, an error was committed which entitles the defendants to a new trial.
Murray v. Smith, (1 Duer, 412,) was reversed by the Court of Appeals solely on that ground, although, in the opinion of the court, the evidence excepted to ought not to have influenced the verdict of the jury. When improper evidence has been given, and its reception was excepted to, the court will not, on a bill of exceptions, attempt to speculate as to its probable effect upon the conclusions of the jury, unless it can clearly see that it could not have had any influence upon them in forming their verdict.
*340 We do not see that we can say this evidence might not have prejudiced the defendants’ case in the estimation of the jury.
The character of a witness on the part of the plaintiffs was thoroughly impeached, if credit is to be given to the impeaching witnesses. A supporting witness, who saw him for some six months, twelve years prior to the trial, and who had not seen him since then until within six months of the time of the trial, and .who had “never heard him spoken of one way or the other,” was allowed to testify that he considered him “ a credible witness.” To the admission of this evidence the defendants objected and excepted.
This decision cannot be sustained, unless it be a sound rule that a witness whose character is impeached may counteract the effect of the impeaching evidence by proof that, in the opinion of others who have but a slight acquaintance with him, and never heard him spoken of one way or the other, and who know nothing of his general character, he is a credible witness.
I presume no one holds the opinion that a witness can be impeached by the testimony of persons who really know nothing of his general character, and never heard him spoken of, that they do not consider him a credible witness. If such evidence is incompetent for the purpose of impeaching a witness, I think it equally so to sustain one who has been effectually impeached. In such cases, general character is the broadest form of inquiry admissible. Particular offences or vices cannot be proved or disproved.
The practical question is, has the witness such a want of moral character, taking the character which he has acquired among those who know it as the standard, that others cannot credit what he may say ?
We think the evidence received to sustain the character of the impeached witness was improperly admitted, and that on that ground also the defendants are entitled to a new trial.
The verdict must be set aside, and a new trial ordered, with costs to abide the event.