Robertson, J.
—Upon the question of a conditional delivery of the merchandise which forms the subject of controversy in this case, my views coincide with those of the learned judge before whom the case was tried. If the delivery of the ships’ receipts to McKean was conditional, and he was not at liberty to part with them unless he got the money, then the plaintiffs did not, by that delivery alone, lose their right to reclaim the merchandise from any one who took it with notice of such condition, or who did not advance anything on the faith of Patterson’s possession of the merchandise, receipts, or bills of lading. A previous advance, in reliance, merely, upon the promise of Patterson that he would place such merchandise in the defendants’ possession, would not be sufficient to protect it against such reclamation; Keeler v. Field (1 Paige, 312); Haggerty v. Duane (1 Paige, 321,) and cases cited by plaintiffs’ counsel;) and subsequent advances upon the faith, merely, of other flour and other bills of lading, against which it was charged, would not protect this flour against the plaintiffs’ reclamation. But I think there are other facts in the case which have a strong bfearing upon the question of the conditional.delivery of the bills of lading, *577 the effect of such bills in inducing the defendants to make advances, and the sanction by the plaintiffs of the delivery of such bills.
The complaint alleges that the flour in question was sold upon the representation of Patterson, that the defendants were to advance the price, and that the holder knew it. It further alleg'es, that 11 on the 12th of May, 1854, ‘ the plaintiff handed the ships’ receipts to Patterson, who promised to get the money from the defendants,’ and pay it to the former; but that, on the next day, 1 he paid only 5,000 dollars instead of the amount agreed;’ and stated 1 that the defendants refused to advance the money.’ ” The advances made by the defendants to Patterson were all made under a general agreement by the former to advance seven dollars a barrel on all flour shipped by him; which agreement was made on the 29th of April, 1854. On the 5th of May, following, the flour in question was sold by a broker (McKean) to Patterson for the plaintiffs, and a sold note delivered to him. From that day until the 11th was consumed in shipping the flour on board of a vessel bound for Liverpool. On the 9th of May, during the time of such lading, the defendants, pursuant to their agreement in April, advanced to Patterson upon such flour an amount equal to that agreed upon. Before the 12th, they advanced no other moneys to him upon the shipment of flour. On the 12th of May, the plaintiffs’ clerk (Hull), with the assent of the plaintiff Wilmot, delivered to the broker who sold the flour the ships’ receipts therefor, directing him “ to bring them back if he did not get the money;” he having stated that “he could not get the money without them, and that the defendants were to advance it.” After such broker left with the receipts, Wilmot told his clerk “he had been taking a risk.” On the same day, Patterson got them from the broker—under what circumstances does not appear — exchanged them for bills of lading of the same merchandise, and delivered them to the defendants; who, upon such delivery, paid him over 6,600 dollars as advances upon other flour. The next day he gave the plaintiffs a *578 check for 5,000 dollars, which was paid. The vessel having sailed on the 13th or 14th of May, the plaintiff Wilmot-—• on the 16th of May, on being shown at his request, by Mr. Nimjnons, who was interested in the defendants’ firm, their account with Patterson in their books — said, “ it appeared to him that they had taken his flour to pay Patterson’s debt;” but he took a memorandum of the payments, on which the advances, on the 9th of May, appeared. Nothing was then said, so far as appears, of the ships’ receipts or bills of lading, or their wrongful delivery; nor was any claim made for the restoration of the goods or bills of lading. On the next day (the 14th), the plaintiff, Wilmot, received, without returning it, an acceptance, by 'the defendants, of Patterson’s order on them for the proceeds, deducting the ■defendants’ advances, of the sale of the flour in question, .and other merchandise, by the defendants in Liverpool; at •the foot of which he himself drew a form of limitation of -the amount of the advances. On the 20th, three days -afterwards, he took out an attachment against Patterson; .and, in the affidavit to obtain it, swore that he delivered the flour to Patterson on the 12th of May, which was the very day on which the broker obtained the ships’ receipts. Wilmot also applied to a Mr. Wallace on the 18th of May, after Patterson left for Europe, to hold surplus proceeds of sales for his benefit; and said that Patterson had given him an order for the surplus proceeds of flour consigned by him to the defendants. There is no evidence in the case that the defendants ever had any notice of any impropriety in the mode of obtaining the bills of lading, or that the plaintiffs ever demanded them or the flour.
Under these circumstances, it is too late for the plaintiffs to set up any absence of authority on their part to MeKean or Patterson to deliver the bills of lading, or that the . defendants were not bona fide purchasers after the goods were sold with their own full knowledge. It does not appear precisely in what capacity the broker received the bills of lading, whether as agent of the -plaintiffs or Patterson; he had an interest in completing the transac *579 tion which he had begun, and as there had been a previous refusal to deliver .to Patterson, it would seem that he was looked upon as at most an indifferent party, but clothed with authority at least to use the receipts to get the money, and to such an extent as to induce Wilmot to believe he was running a risk in giving it to him. Why the latter should part with- the custody of such receipts to the broker, as an agent of the buyers, instead of completing the delivery by tendering them and demanding the price, remains a mystery; but he did so, at the hazard of furnishing Patterson with the means of deceiving the defendants. Although it does not appear how Patterson obtained the receipts, or what passed on his delivery of the bills of lading to the defendants, there can be no doubt, from the evidence already alluded to, that when Wilmot told the defendants they had taken his flour to pay a debt to them, he knew that they had the bills of lading, and when he drew the qualification to Patterson’s order for the proceeds, that the money paid by Patterson to him came from them, because at the last period he had the account before him. Silence under such circumstances as to a condition of the delivery of the ships’ receipts, clearly ought to work an estoppel against the plaintiffs as to such condition; for their claim to the flour was based on the non-payment of the price, not on any conditional delivery of the bills of lading, or ships’ receipts. The defendants completed their advances on the 12th of May, (without which the plaintiffs probably would never have received the five thousand dollars paid on the 13th of May, and which they were bound to believe came from the defendants,) upon the strength of receiving such bills of lading; without receiving them, they might have refused to make the last installment of such advances, and claimed that the agreement, being entire to advance on all flour generally, although the advances were applied upon particular merchandise, they having the flour in their possession, might retain it or its proceeds for a general balance due to them as factors. The plaintiffs, therefore, having furnished *580 Patterson with the means of deceiving the defendants, as between two equally innocent parties, ought to be the sufferers. But the case is not left to any such estoppel alone, however strong, for the plaintiffs agreed to authorize the defendants to sell the flour, and to receive the proceeds Of it when so sold, and other merchandise, after deducting the defendants’ advances in part payment, of the amount due from Patterson, thereby waiving all condition in the delivery; for such will be found to be the legal result of the order of Patterson for such proceeds, the acceptance of it by the defendants, the retention of such acceptance by the plaintiff, Wilmot, and his receipt of the 13th of September, 1854.
There can be no doubt what order and acceptance is meant in the receipt of September 13th, and still, less that the plaintiffs were bound, by the receipt of such accepted order and its proceeds, to do something in return, which was to perform the tacit condition on which it was delivered. Any previous dissatisfaction with such order is entirely merged in the accepting both it and its fruits; indeed the appending, by Wilmot himself, of a limitation of the. advances to such order, would have been inconsistent, with a final intent to reject it; the receipt and filing of the acceptance is still stronger, if not conclusive evidence of the intent of taking such acceptance, for the receipt explains itself.
If the delivery of the merchandise or the bills of lading had been conditional, and the defendants not been bona fide purchasers, any sale by them would have been unauthorized and a tort. The title to the property could not be changed; Palmer v. Hand, (13 J. R. 434;) Andrews. Dieter ich, (14 Wend. 31;) and the purchasers from the defendants would have taken none. But the plaintiffs could not have sued such "purchasers after receiving the proceeds of the sale, as such, from the persons selling. (Outwater v. Dodge, 6 Wend. 391.) Such sale was clearly ratified by them, and such ratification was effected by constituting the defendants either agents of the plaintiffs or valid pur *581 chasers from Patterson. Of the former there is no pretence, as this action is not brought for no.t' accounting for such sales. But there is also the still further fact that the plaintiffs were to receive the proceeds of the sales of other flour, as well as their own; and agreeing that the defendants’ advances, on all the flour should be first deducted, they must be held under such circumstances to have parted with something as an equivalent for the right thus acquired of* holding the defendants accountable for the proceeds of the sale of other flour. What else could that consideration under the circumstances have been, except their lien, if any, on the flour sold by them; and that not merely to the extent of the money to be received under the order, but entirely?' It is not the case, therefore, simply of a party defrauded receiving back part of his goods or payment of part of the proceeds, which would not affect his claim to the rest. It is receiving the proceeds of sales, which the plaintiffs induced the defendants to make and promised to ratify, provided the proceeds were paid over to them, on account of their claim for their purchase money.
The law follows the rules of morality in such case, and estops the plaintiffs from denying that ,the delivery to the defendants was complete, and authorized by them; or in any way claiming a return of the goods or their value. The deduction of the defendants’ advances strengthens the argument, as an admission that they were a lien; and although the plaintiff, Wilmot, refused to sign a receipt, discharging the defendants, he himself drew the one actually signed. If he supposed that he could take whatever he could get from any source, and acknowledge it as derived therefrom, and still hold the defendants liable,, he was mistaken in his view of the law. He might have done so if dealing with Patterson alone, or if the defendants had actually incurred a liability to him; but he did not even demand either the goods or bills of lading from them, so as to make them liable before he received the order.
But it is said that the defendants were guilty of fraud *582 in obtaining possession of the goods of the plaintiffs, and that the-latter could not be bound by receiving back a part of what they. had been defrauded. The difficulty with such a proposition is, that the complaint does not allege, or the evidence sustain, such a proposition. JVo collusion is alleged between the defendants and Patterson to bring the case within the principle of Allison v. Matthieu (3 J. R. 235). The complaint is not merely for chattels converted, or goods sold and delivered; but is entirely special, made up of particular occurrences, constituting circumstances of suspicion only; and that only of some covert act or design not expressed. There is no pretence of any sanction by the defendants of any fraud or false representation of Patterson, or of any authority by them to him to procure the flour for them, or to make' any .representa- - tions on their behalf, or any ratification by them of any misconduct of his. Under such circumstances, it is difficult to see how they could be guilty of fraud in the purchase of the goods. . All pretence is equally absent of any combination or fraud by the defendants to procure the delivery of the goods, or to get possession of the bills of lading, or of any other fraud, except that of receiving the flour as security for an antecedent debt; knowing, merely, that it had not been paid for. Such a species of fraud, if one at all, is not incapable of being waived. The allegations in the complaint consist principally of representations by Patterson at the time of the purchase, the delivery to him of the ships’ receipts, and the possession of them, as well as the bills of lading by the defendants. It also avers knowledge by the defendants at some time (but when is not stated) of Patterson’s design to purchase the flour in question, and of his representations, and the delivery of it on the faith thereof; also, that the sale was for cash, and the price not paid. It is true that it contains & charge, that it was so contrived, on the part of the defendants, to obtain such flour through the aid of Patterson, and then apply it to the payment of a prior debt. But as no general mode of contrivance had been mentioned, and no special *583 one, exeept that (if any) contained in the previous allegations, such averment becomes a mere conclusion of law, and is only equivalent to saying, “whereby it was contrived ” that the defendants should obtain the goods. It is to be taken rather as the consequence or purpose of the acts previously narrated than an independent charge of fraud.
There are some allegations in the complaint of artifices used by the defendants to conceal from the plaintiffs an intended departure of Patterson for Europe, and suggestions by them to him so to absent himself; but for what purpose is not stated; and it is difficult to perceive the connection of such allegations with any fraud charged. Patterson did not accompany the goods on the voyage; and he afterwards returned. It is not very plain how his bodily presence would have better enabled the plaintiffs to have recovered their goods, or their value, if entitled to them or it. They might, possibly, have arrested and otherwise punished him; but that would not have compelled the defendants to have delivered the goods which had previously departed, or make compensation for them. Although such acts, like all other evidence of clandestinity, might, if proved, be circumstances of suspicion of some undefined intended wrong, they do not attach themselves to any particular fraud charged, and may, therefore, be disregarded.
Apart, therefore, from any knowledge by the defendants of a misrepresentation by Patterson, at the time of his purchase, that the former were to advance the whole purchase money, and of any fraud by him in obtaining the ships’ receipts, or delivering them to the defendants, the case stands simply upon the receipt by the latter of bills of lading, for goods which they knew to have been bought from the previous owner for cash, and not to have been paid for. This would, at most, make the delivery conditional, and exclude a charge of fraud. Now there is not a particle of evidence in the case to which we have been referred, or that I have been able to find, even in the testimony of the plaintiff Wilmot himself, that the defen *584 dants ever knew of any representation by Patterson of an intended advance by them of all the purchase money; or how, or upon what condition, he obtained the bills of lading. Still farther than this; it does not appear that Patterson ever made any representation until after the sale to him, or before he obtained the ships’ receipts; that the defendants were to advance the whole purchase money, so that the sale, at least, was not made on such representations ; and it may be remarked that, as the complaint itself alleges, that the plaintiffs “ handed the ships’ receipts to Patterson, who- promised to get the money; the plaintiffs would hardly be permitted to vary this by evidence, so as 'to establish that they were delivered—not upon a promise, but a condition not to be delivered without-payment of the money.
As, therefore, there was no evidence of any such fraud in this case as would make the defendants privy to the original fraudulent purchase, or a subsequent fraudulent delivery of the evidences Of title, there was no such liability for any fraud by the defendants to the plaintiffs, at the time of the delivery of the order of the 14th of May to the latter, as to prevent the acceptance of such order and its fruits by the receipt of the 13th of September, 1854, from operating as a waiver of all claims against the defendants. Indeed, the charge of fraud, if it consisted only of a contrivance by the defendants to obtain possession of the flour to pay a prior debt, falls to the ground. For such a purpose, the contrivance could only be adopted after the debt was incurred; whieh, in this case, was after the sale of the goods, and on the faith of a promise to deliver the bills of lading therefor. Those bills, as emblems of ownership and warrants .for possession, were obtained without the slightest artifice by the defendants, or -any knowledge by them of any fraud employed by Patterson in obtaining them, so far as appears in evidence; and no charge of such artifice or demand of such bills, or possession of such property, was made until the beginning of this action. It would have been an extraordinary specu *585 lation for the defendants to have advanced 13,000 dollars on the expectation of getting the bills of lading by fraud.
I Have not deemed it necessary to refer to the proceedings taken by the plaintiffs in the attachment suit and the affidavits on which they were founded; as, however strong, they may amount to mere evidence of a recognition of the contract with' Patterson, as intimated in the opinion of the present Chief Justice of this court, on the former argument of the case. (6 Duer, 328.)
Some exceptions were taken to the exclusion of testimony, which require to be considered, with the exception of the competency of Nimmons as a witness, which was disposed of when this case was before the court before-. They principally relate to conversations between the plaintiff Wilmot and Patterson respecting the order of the latter upon the defendants for the proceeds of the sale at the time Wilmot saw it, and also between Wilmot and the broker McKean as to the ships’ receipts after they had been parted with; and to the absence of any suggestion by the defendants or on their behalf to Patterson to leave for Europe. As to the first, there was no evidence to establish any agency of Patterson for the defendants, or any participation of the latter in any fraudulent acts of his, so as to make them confederates; a mere charge of such confederacy is not enough. The derivation of title through Patterson, by the defendants, does not make his declarations evidence, and any representations made by him respecting the order could not constitute any part of the res gestee, which consisted either of "the sale and delivery of the goods or their evidences of title, or the acts of the plaintiffs in receiving and retaining the acceptance of the order. The same principles apply to McKean’s conversations; there was* no allegation to be sustained of fraudulent representations by him; the directions given to him, were conceded, and had already been proved in the strongest manner for the plaintiffs. As to the suggestions to Patterson to leave, the defendants had a right, by evidence of the negative, to repel the charge.
*586 I do not find, therefore, any error in any of the rulings complained of. Judgment should be rendered in the action for the defendants, dismissing the complaint with cost's.
Hoffman, J.
—The first observation to be made upon this case, is the entire failure of the plaintiffs to prove the least authority from the defendants to Patterson'to purchase the flour, or to make any engagement in their behalf respecting it, or their knowledge of such purchase before they had obtained the ships’ receipts and bills of lading, and made advances.
The slight evidence which connects the plaintiffs and defendants in the transaction is, that the former were informed that Patterson expected to get the money from the latter; that he' could not get it without the receipts; they (the plaintiffs) trusted his agent, McKean, with the receipts to go to Richardson to get the money; he was to bring them back if he did not get it. The sale, it is to be remembered, was made through Hull, clerk of the plaintiffs. The bill made out by him, is to Patterson. The evidence as to Nimmons examining the flour is very unimportant and slight. Hull’s account of it is, that they were talking of flour. Wilmot had his hand on some, and said it was good Canada flour. Nimmons says he went to Wilmot to inquire as to the character of brands, with a view to advancing on Patterson’s consignments, and Wilmot says he exhibited samples to Nimmons, and gave it a recommendation; very little was said at the time.
This is the substance of all the evidence of any dealing or negotiation, directly or indirectly connected with the flour, between the plaintiffs and defendants, prior to the 16th of May, 1854.
And another branch of the plaintiffs’ case may be dismissed with the observation, that there is not any evidence which can warrant the imputation of complicity between the defendants and Patterson to defraud the plaintiffs.
It is clear that the plaintiffs sold to Patterson, and to no.one else; looked to him and no one else for payment; *587 and .relied upon his getting the money, and from the defendants, to pay them. They trusted Patterson’s agent, after repeated refusals, with the ships’ receipts, on the representation that the money could not otherwise be obtained, and on his promise to get it.
The remark appears here obvious, that when the receipts were required as the means of obtaining the money from the defendants, the plaintiffs could not but have been led to the conclusion that the defendants wanted and meant to rely on them for their security, and would not advance without them. They put them in Patterson’s power to use them; advisedly to get money upon them.
It may b.e conceded that, as between Patterson and those, like creditors, who could stand in no better position, and' the plaintiffs, the delivery was conditional, so that no property to the flour passed to him; Smith v. Lynes (1 Seld. 41; 3 Sandf. S. C. R. 203) appears to me to cover the case.
The next point raised upon the pleadings is the true character of the dealings between Patterson and the defendants, connected with the flour in question. The following facts are established; I believe they are all that are material on this part of the case.
In April, 1854, an arrangement was made between those parties, through Nimmons, by which shipments of flour, to a considerable but then undefined amount, were to be made to Liverpool, consigned to the defendants’ house there, and they to advance to Patterson, at the rate of seven dollars per barrel, on brands which should suit them. The defendants were to have bills of lading for their advances.
The advances of the defendants were as follows:
April 29,1854............... ...............$19,000 00
May 1, ____________... 3,388 00
May 3, ______________ .............. 5,000 00
May 8, _______________ .............. 5,000 00
May 9, _______________ .............. 13,219 00
Mav 10. ______________ 5.329 90
$50,996 90
*588 They had bills of lading on hand at the following dates for the following amounts in barrels:
Bbls.
April 29, per Dacotah,_________________ _______1,682
April 29, per Garrick,.........................1,040
May 1, do (presumed),_______________ 509
May 3, 8 and 10, per Guy Mannering,. ...........2,036
May 9 or 10, Tuscarora, dated 5th May,.......... 1,000
May 8 or 9, by Dacotah, 200 bbls., part of plaintiffs’
flour; bill lading dated 6th May,____________ 200
6,467
5,467, at $7 advance, is...... ............$38,269 00
1,000, at $7.50 advance, is________________7,500 00
$45,769 00
May 10, over advanced,____________________ 5,227 90
$50,996 90
May 12, advanced .1...................... $6,651 10
May 11 or 12, received bill of lading per Washington for 1,697 barrels, dated 11th May,
Advances as above,___....................$50,996 90
Add,.'.................................. -6,661 10
$57,648 00.
Barrels, .............................. 6,467
Add ......... ........................ 1,697
Total,............................ 8,164
Of which 7,164, at $7, is____■.............. $50,148 00.
1,000, at $7.50, is'.’........;...... 7,500 00
$57,648.00
*589 Thus, on the 11th of May, or before the bill of lading by the Washington was in hand, the defendants had advanced $50,996.90, and had received bills of lading for 6,467 barrels, including the 200 by the Dacotah; 5,467 of these were at the advance of $7, which makes $38,269, and 1,000 at $7.50, being $7,5.00. The total, $45,769. The difference is $5,227.90; an excess of advance on this basis. The 1,697 barrels at $7 is $11,879, and deducting such excess, there remains the sum of $6,651.10, paid by the check of May 12, 1854.
It is then clear that the defendants did not, and would not consummate their agreement to make advances until the delivery of the bill of lading for the 1,697 barrels on the 11th or 12th of May. They had over-advanced $5,227.90 on the faith, of a promise to deliver bills of lading to cover it. It is warranted by the evidence to say, that this promise referred to the 1,697 barrels in question. They advanced $6,651.10 when they got such bill of lading. They never would have advanced that sum without it, or an equivalent.
This appears to me to show that,, as to this sum of $6,651.10, the defendants were, in the utmost strictness of the rule, bona fide holders of the bill of lading by the Washington, and entitled to a lien upon the flour to that extent, as for present advances on the faith of the documents. Coupling these facts with the fact that the receipts were delivered for the avowed purpose of enabling Patterson to raise money, and from the defendants, that circulation was given to them, and the bill of lading procured by them for such a purpose, the case séems to me entirely within the range of the rule as laid down in the leading-authorities. (See Caldwell v. Bartlett, 3 Duer, 341; Keyser v. Harbeck, Id. 373 ; Brower v. Peabody, 3 Kernan, 121 ; Dows v. Perrin, 16 N. Y. R. 325.)
What would be the rights of the parties on this basis ? The defendants have a first lien on the flour for this advance. The plaintiffs, a claim for the balance of their account. The net proceeds of the flour were, say, $13,740. The *590 advance and charges would be about $6,851; marine insurance being $190, which would leave, say, $6,889; of which, $2,811.27 has been paid. The balance is, say, $4,077.73.
But, again, on the facts of this case, my impression is, that the defendants could have sustained their claim for the whole of the balance of $5,227.90, found as the excess of their advances by the 11th of May. We are perfectly warranted in saying that this excess was advanced on the faith of the flour shipped in the Washington; and that the title to it would be acquired by Patterson, and given to them. The flour was either actually on board on the 9th of May, or going on board. By the 11th it was all shipped. On the 12th May, the documentary papers were delivered; the contract to obtain them, on which the advance was made, was performed; and on the 12th of May they credit Patterson with the exchange on the Liverpool house, Whether this transaction thr'ew them upon the flour consigned, solely, for their repayment, or left Patterson ultimately liable, it is clear that it left the avails of the flour as the fund first to be looked to; and the exchange was an order for their application.
The cases which hold that the taking of securities for an antecedent debt, when that debt is not extinguished, does not constitute a bona fide holder for value, are cases in which the prior debt was wholly disconnected from the particular transaction. See the cases cited by the plaintiffs’ counsel. I find no case hostile to the position, where the party advances on the credit of an engagement to get and deliver property; and the real owner has placed the promisor in the position to fulfil his agreement; and he has done so.
But be this accurate or not, as a naked question, it is of moment in construing the acts of the plaintiffs. The vessel had sailed on the 13th or 14th of May. On the •16th or 17th, one of them is apprised of the claim of the defendants on the flour for an advance of $13,279 on the two parcels; of $11,879 on the 1,697 barrels by the Wash *591 ington. A transcript of the account is given to him. He saw there that the advance was on the 9th of May. He knew he had not delivered the receipts till the 11th; and then, instead • of placing himself on his legal rights, he makes no such demand; takes the order of Patterson; waits till the account sales arrive, which are dated in August; receives, on the 5th of September, $2,500; and on the 15th of the same month $311.27 more; and gives the strong receipt produced in evidence.
I regard all this as an unequivocal recognition of a claim of the defendants; which, as to $6,661.10, was strictly legal; and as to $5,227.90, was as equitable as his own.
But again, upon the point of ratification, the case has not been in any material point varied from the former case; and the opinion of the general term upon that subject is not open to dissent, and is unanswerable if it were so. (See 6 Duer, 328.)
Bosworth, Ch. J., concurred in ordering judgment for the defendants, on. the ground that the acceptance of Patterson’s order by the plaintiffs, and their subsequent acts, are a bar to their right to maintain this action.
New trial denied, and judgment ordered in favor of the defendants.